# Illinois Official Reports

## Appellate Court

*Terra Foundation for American Art v. DLA Piper LLP (US)*, 2016 IL App (1st) 153285

| | |
|---|---|
| Appellate Court Caption | TERRA FOUNDATION FOR AMERICAN ART and TERRA MICHIGAN AVENUE PROPERTY, LLC, Plaintiffs-Appellants, v. DLA PIPER LLP (US), Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-15-3285 |
| Filed | August 12, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 15-L-001866; the Hon. Sanjay T. Tailor, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Chapman Spingola, LLP, of Chicago (Robert A. Chapman and Shannon T. Knight, of counsel), for appellants.<br><br>Much Shelist, P.C., of Chicago (Martin J. O'Hara and Shawn M. Staples, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE ROCHFORD delivered the judgment of the court, with opinion.<br>Justices Hoffman and Delort concurred in the judgment and opinion. |

**OPINION**

¶ 1    Plaintiffs-appellants, Terra Foundation for American Art, a not-for-profit organization, and Terra Michigan Avenue Property, LLC (collectively referred to as Terra), brought this action alleging malpractice against defendant-appellee, DLA Piper LLP (US) (DLA), a law firm, which Terra had retained in connection with the sale of real estate. The circuit court dismissed Terra's complaint finding that it was barred as a matter of law by the applicable statute of repose. 735 ILCS 5/13-214.3(c) (West 2014). We affirm the dismissal of Terra's action.

¶ 2                                    I. BACKGROUND

¶ 3    In 2005, Terra agreed to sell three pieces of property located at 664, 666, and 670 North Michigan Avenue in Chicago (the property) to entities controlled by Prism Development Co., which were later succeeded in interest by NM Project. DLA represented Terra throughout the negotiations for the sale, including the final closing in 2013.

¶ 4    NM Project intended to build a 40-story mixed use building (the building) on the property, which would include retail, office and residential parcels. As part of the sale, Terra was to receive an "up front" payment of $17.5 million and, upon closing, ownership of the retail and office parcels. NM Project would own the residential parcel.

¶ 5    Because the ultimate square footage of the retail parcel would control its potential rental income and its resulting economic value to Terra, NM Project's cash payment was to be adjusted at the closing based on the completed size of the retail parcel (the retail parcel credit). On April 27, 2005, Terra and NM Project executed a term sheet that included a formula for determining the retail parcel credit using baseline estimates for the space of the retail parcel: 8041 square feet for the first floor and 10,728 square feet for the second floor. Upon completion of the building, if the resulting rentable square footage of the first floor was less than the baseline estimate, NM Project would pay Terra $5500 for every square foot of reduced space. If the actual rentable square footage of the first floor was greater than the baseline estimate, Terra would pay NM Project $5500 per square foot of increased space. As to the second floor, if the resulting rentable square footage was less than the baseline estimate, NM Project would pay $800 per square foot for any such reduction. If the rentable square footage of the second floor was greater than the baseline estimate, Terra would owe nothing to NM Project for this additional square footage.

¶ 6    Consistent with Terra's wish that the common space for the other parts or parcels of the building not be included in the measurement of the retail parcel, the term sheet referred only to the "contiguous" space of the first floor of the retail parcel and expressly excluded "the Common Area Parcel[1] and lobbies for the Office Parcel and Condominium/Parking Parcel [residential parcel] and building service areas (including, but not limited to, loadings docks, freight elevator lobby, mechanical space and other 'back of the house' space)" (exclusionary language) from the rentable area of the retail parcel.

¶ 7    In the several years following execution of the term sheet but before the final closing, Terra and NM Project entered into a series of agreements that governed the transaction (collectively

---

[1]The term sheet defined the common area parcel as "[t]he common lobby, elevators, spaces, and shafts for the building's plumbing, electrical, and mechanical systems and similar spaces."

referred to as the agreements). These agreements included the following, none of which included the exclusionary language.

¶ 8    On June 21, 2005, Terra and NM Project executed a purchase agreement that, in section 9, set forth the formula for determining the retail parcel credit. That formula was consistent with the language contained in the term sheet, except that section 9 did not contain the exclusionary language.

¶ 9    The first amendment to the purchase agreement (first amendment), which was executed on May 29, 2007, provided for how the retail parcel would be measured for purposes of determining the retail parcel credit. Specifically, paragraph 5 of the first amendment provided that rentable square footage or rentable square feet was to be calculated pursuant to the "Standard Method for Measuring Floor Area in Office Buildings (ANSI/BOMA Z65.1-1996), An American National Standard Approved June 7, 1996 by American National Standards Institute, Inc., published by Building Owners and Managers Association International" (hereinafter BOMA 96). According to Terra, BOMA 96 is a method of measurement which would allocate a *pro rata* share of the common space of the building to the rentable area of the retail parcel unless that space was, otherwise, expressly excluded.

¶ 10    In March 2008, Terra and NM Project entered into a third amendment to the purchase agreement and other related agreements (third amendment). Section 6 of the third amendment required that Terra provide a letter of credit as security for any possible retail parcel credit to be made by Terra. To determine the amount of the line of credit, NM Project was to provide an estimate of the rentable square feet of the retail parcel based on the final or substantially final plans for the building. Terra and NM Project were then to agree on the amount, if any, Terra might be responsible to pay under the retail parcel credit based on those estimates. Terra would submit a letter of credit for that amount before construction began. However, if there was a dispute as to the measurement of the retail parcel, the issue was to be resolved through an agreed alternative dispute procedure which included arbitration.

¶ 11    In October 2009, Terra and NM Project executed a declaration of covenants, conditions, restrictions, and easements (the 2009 declaration), which defined how the rental, residential and office parcels were to share the building and its various components. The 2009 declaration was superseded by a 2012 declaration of covenants, conditions, restrictions, and easements (the 2012 declaration).

¶ 12    On March 2, 2010, NM Project and Terra entered into a letter agreement (the March 2010 letter) that amended the purchase agreement and other related agreements. The March 2010 letter included agreements to exclude the basement space of the building[2] from both the retail and the office parcels, exclude a designated limited portion of the retail parcel from the rental square footage of the first floor and remeasure the space under the fire stairs or beams upon completion of the retail parcel and adjust the amount due under section 9 of the purchase agreement accordingly.

¶ 13    At different stages of the building's development, Terra and NM Project disputed the size of the rentable space of the retail parcel.

_____

[2]The term sheet included a baseline estimate of 3000 square feet for the basement of the retail parcel and NM Project was to pay $300 per reduced square foot for this space. This space is not at issue on appeal.

¶ 14    In order to determine Terra's obligation for posting a line of credit, pursuant to the third amendment, in late 2010 NM Project provided Terra with its calculations of the expected square footage of the retail parcel based on the final plans. NM Project projected the rentable area for the first floor of the retail parcel to be 10,363 square feet, 2332 square feet greater than the baseline estimate, and therefore, NM Project contended it would be entitled to a retail parcel credit of $12,771,000. The rentable square feet area for the second floor of the retail parcel was calculated to be 12,587 square feet, which was 1859 square feet greater than the baseline estimate. Pursuant to the parties' agreements, NM Project was not entitled to receive a credit relating to the second floor.

¶ 15    Terra disagreed with NM Project's calculations, because they included an allocated share of the common areas for the other parcels. Terra believed that, upon completion, the first floor rentable area would be 7403 square feet and the second floor rentable area would be 9183 square feet. Therefore, Terra contended NM Project would owe an additional $4,737,000 at the closing as the retail parcel credit.

¶ 16    To resolve the dispute, Terra and NM Project engaged in the agreed alternative dispute procedures. An October 11, 2010, arbitration award provided that, based on the final plans, the first floor rental space would be 8801 square feet and the second floor would be 10,363 square feet. Based on this award, Terra would owe NM Project in excess of $3.8 million at the closing as the retail parcel credit and was, therefore, required to post an appropriate line of credit pursuant to the third amendment.

¶ 17    Near the completion of the building in late 2012, NM Project determined that the final rentable square footage of the first floor of the retail parcel was 8857 square feet and the second floor was comprised of 10,450 rentable square feet. NM Project asserted that, based on these measurements, Terra would owe a retail parcel credit of $4,265,000 at closing.

¶ 18    Terra again challenged NM Project's measurements, contending that only the contiguous space within the retail parcel should be measured. Terra calculated the rentable square feet of the first floor to be 7835 square feet, with the second floor including 8839 square feet. Using these measurements, Terra maintained that NM Project would owe a retail parcel credit of $2,643,619 at the closing.

¶ 19    To resolve their differences, NM Project and Terra again engaged in arbitration. On January 30, 2013, the arbitration panel issued an award, which provided that the BOMA 96 calculations showed that, as constructed, the first floor rentable space included 8733 square feet and the second floor included 10,628 square feet. Pursuant to this award, Terra paid NM Project approximately $3.8 million as the retail parcel credit at the February 13, 2013, closing.

¶ 20    On February 23, 2015, Terra filed a legal malpractice suit against DLA, alleging negligence in its representation of Terra with regard to the sale. However, pursuant to a tolling agreement, the complaint was "deemed filed on October 7, 2014." Terra asserted in its complaint that, throughout the negotiations of the agreements, it had expressed to DLA its concerns that the exclusionary language of the term sheet had not been included in the agreements.

¶ 21    Terra further alleged that DLA breached its duty of care by failing to advise Terra that using BOMA 96 would necessarily include the common areas for the other parcels in the measurements of the rental area of the retail space and by failing to include the exclusionary language of the term sheet in the agreements. Terra further alleged that had it known that the failure to include the exclusionary language in the agreements would result in the common

areas for the entire building being added into the calculation of the rentable area of the retail parcel, it either would not have agreed to the use of BOMA 96 or would have "insisted" on the inclusion of the exclusionary language. Alternatively, Terra would have "insisted" that the baseline estimates, which had not included the common areas, be "grossed up" to include the common area square footage.

¶ 22 Terra believed that if the measurement of the retail parcel had been calculated consistently with its expressed intent at the closing, NM Project would have paid Terra $2.6 million under the retail parcel credit provision, rather than Terra paying NM Project over $3.8 million. Terra's complaint thus alleged that as a result of DLA's negligence it had suffered damages in the amount of $6,449,619 (the total of what Terra paid and the amount Terra contends it was owed as to the retail parcel credit) and had incurred $500,000 in legal fees and costs associated with the arbitrations.

¶ 23 On April 3, 2015, DLA filed a motion, pursuant to section 2-619(a)(5) of the Code of Civil Procedure (Code) (735 ILCS 5/2-619(a)(5) (West 2014)), to dismiss the complaint as untimely under both the applicable statute of limitations (735 ILCS 5/13-214.3(b) (West 2014)) and the statute of repose (735 ILCS 5/13-214.3(c) (West 2014)).

¶ 24 On October 20, 2015, the circuit court granted the motion and dismissed the action with prejudice, based on the language of the statute of repose providing that a legal malpractice claim "may not be commenced *** more than 6 years after the date on which the act or omission occurred." *Id.* The court concluded that "the alleged negligence occurred when the First Amendment was executed [May 29, 2007]. That's the document that contained the *** BOMA '96 as the standard for measuring the retail parcel. It did not include the exclusionary language that was included in the term sheet." The circuit court then denied Terra's oral motion to amend the complaint, which Terra claimed would "replead in separate counts the original [c]omplaint's separate and independent acts of malpractice, including a number of negligent acts that occurred within the six-year repose period." Terra timely appealed both the dismissal of its complaint and the circuit court's denial of leave to file an amended complaint.

¶ 25                                                    II. ANALYSIS

¶ 26 A motion to dismiss under section 2-619 of the Code "admits the legal sufficiency of the plaintiffs' complaint, but asserts an affirmative defense or other matter that avoids or defeats the claim." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 59 (2006). When considering such a motion, a court must accept as true all well pled facts in the complaint and any reasonable inferences drawn therefrom. *Purmal v. Robert N. Wadington & Associates*, 354 Ill. App. 3d 715, 720 (2004). Section 2-619(a)(5) more specifically allows a cause of action to be dismissed if it was not commenced within the time limited by law. 735 ILCS 5/2-619(a)(5) (West 2014). We review a dismissal under section 2-619 *de novo*. *Peregrine Financial Group, Inc. v. Futronix Trading, Ltd.*, 401 Ill. App. 3d 659, 660 (2010).

¶ 27 This appeal also requires us to construe section 13-214.3 of the Code. The well recognized rules for such a task were recently outlined in *Hendricks v. Board of Trustees of the Police Pension Fund*, 2015 IL App (3d) 140858, ¶ 14:

> "The fundamental rule of statutory interpretation is to ascertain and give effect to the intent of the legislature. [Citation.] The most reliable indicator of that intent is the language of the statute itself. [Citation.] In determining the plain meaning of statutory language, a court will consider the statute in its entirety, the subject the statute

addresses, and the apparent intent of the legislature in enacting the statute. [Citations.] If the statutory language is clear and unambiguous, it must be applied as written, without resorting to further aids of statutory interpretation. [Citation.] A court may not depart from the plain language of the statute and read into it exceptions, limitations, or conditions that are not consistent with the express legislative intent. [Citation.]"

We review questions of statutory construction *de novo*. *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 267 (2003).

¶ 28    Section 13-214.3 of the Code sets forth the permissible time frame for the filing of a legal malpractice action. First, the section includes a statute of limitations requiring that a legal malpractice action "be commenced within 2 years from the time the person bringing the action knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2014). Second, the section includes a statute of repose providing that a legal malpractice action "may not be commenced in any event more than 6 years after the date on which the act or omission occurred." 735 ILCS 5/13-214.3(c) (West 2014). Finally, the section includes a provision stating that if "the injury caused by the act or omission does not occur until the death of the person for whom the professional services were rendered," the suit may be commenced within two years after the death unless letters of office are issued or the person's will is admitted to probate within that two-year period. 735 ILCS 5/13-214.3(d) (West 2014).

¶ 29    The dismissal of this case was based on the statute of repose. A statute of repose is intended to place a limit on the period of time for commencing suit "regardless of a potential plaintiff's lack of knowledge of his cause of action." (Internal quotation marks omitted.) *Goodman v. Harbor Market, Ltd.*, 278 Ill. App. 3d 684, 690 (1995). As our supreme court has further explained:

> "In contrast to a statute of limitations, which determines the time within which a lawsuit may be commenced after a cause of action has accrued, a statute of repose extinguishes the action after a defined period of time, regardless of when the action accrued. [Citation.] A statute of repose is not tolled by the discovery rule. [Citation.] After the expiration of the repose period, '[t]he injured party no longer has a recognized right of action.' [Citation.] A plaintiff's right to bring an action is terminated when the event giving rise to the cause of action does not transpire within the period of time specified in the statute of repose." *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271, ¶ 16.

A statute of repose, thus, "gives effect to a policy different from that advanced by a statute of limitations; it is intended to terminate the possibility of liability after a defined period of time." *Ferguson v. McKenzie*, 202 Ill. 2d 304, 311 (2001).

¶ 30    On appeal, Terra presents several arguments to support reversal of the dismissal of its cause of action under the statute of repose. First, Terra contends that the statute of repose did not begin to run until the closing on the sale of the property on February 13, 2013, which was the last day of DLA's representation as to the sale. This argument is based on Terra's belief that a transactional malpractice case is treated differently under the statute of repose than a litigation malpractice case. In the alternative, Terra maintains that the earliest the repose statute could begin to run was at the time of the March 2010 letter. Finally, Terra argues that DLA's negligence did not end at the time of the first amendment; rather, it continued with DLA's separate failures to include the exclusionary language in each of the agreements.

¶ 31    "The statute of repose in a legal malpractice case begins to run as soon as an event giving rise to the malpractice claim occurs, regardless of whether plaintiff's injury has yet been realized." *Lamet v. Levin*, 2015 IL App (1st) 143105, ¶ 20. The statute of repose may not be tolled merely by the continuation of the attorney-client relationship. *Mauer v. Rubin*, 401 Ill. App. 3d 630, 639 (2010); *Lamet*, 2015 IL App (1st) 143105, ¶ 23.

¶ 32    The well pled facts of the complaint show that Terra informed DLA of its wish that the common space for the other parcels not be included in the calculation of the rental area of the retail parcel when determining the retail parcel credit. In accordance with that desire, the term sheet contained the exclusionary language. Subsequently, however, the first amendment provided that BOMA 96 would be the method for measuring the rentable area. According to the complaint, BOMA 96 calculations include a *pro rata* share of the common spaces of the whole building unless the common spaces are expressly excluded. The first amendment, however, did not have the exclusionary language included in the term sheet. Terra alleges that DLA negligently failed to include the exclusionary language in the agreement to use BOMA 96 and negligently failed to advise Terra that the *pro rata* share of the common space would be included in the rental area calculations under BOMA 96. These failures of DLA allegedly caused Terra to engage in arbitrations over the measurements of the retail parcel and to make rather than receive a retail credit payment at the closing.

¶ 33    We conclude that the event giving rise to Terra's injuries occurred on May 29, 2007, when Terra and NM Project executed the first amendment and chose BOMA 96 as the method of measuring the retail parcel without the exclusionary language. *Fricka v. Bauer*, 309 Ill. App. 3d 82, 88 (1999) ("The plain language of the statute requires filing of the lawsuit within six years of the acts or omissions that form the basis for the complaint."). The measurements of the rentable area under the BOMA 96 standards, without excluding the common space, resulted in the increases of the retail parcel space, which required Terra to engage in arbitrations to dispute the measurements, incur the related attorney fees and expenses and make the retail parcel credit payment at the closing. Terra's asserted injuries directly flowed from DLA's allegedly negligent omissions and acts as to the first amendment.

¶ 34    Under the statute of repose, Terra thus had until May 29, 2013, to file its malpractice suit against DLA, and its October 2014 complaint, therefore, was untimely. The circuit court properly dismissed the action. See *Evanston Insurance Co.*, 2014 IL 114271, ¶ 16 ("After the expiration of the repose period, '[t]he injured party no longer has a recognized right of action.' ").

¶ 35    In considering the possible harshness of this result, we note that both the October 2010 arbitration award, as to Terra's obligation to post a line of credit, and the January 2013 arbitration award, which established the retail parcel credit at the closing, were based on measurements of the retail parcel using BOMA 96 and indicated that Terra would be responsible to pay a retail parcel credit at the closing. The awards were entered before the expiration of the statute of repose and offered Terra an opportunity to file a timely action under the statute of repose against DLA. Further, the March 12, 2013, closing took place about three months before the running of the statute of repose, giving Terra yet another opportunity to file a timely suit.

¶ 36    Terra argues that a transactional malpractice action is treated differently from a litigation malpractice action under the statute of repose. According to Terra, in a transactional context, the statute of repose does not begin to run "until the completion of the *last affirmative act of*

*representation* in the matter that included the attorney's negligence" and, in this case, that would be the March 2013 closing. (Emphasis added.) Terra relies on *Lamet*, *Snyder v. Heidelberger*, 2011 IL 111052, and *Trogi v. Diabri & Vicari, P.C.*, 362 Ill. App. 3d 93 (2005). We disagree with Terra.

¶ 37    It is true that, in applying the statute of repose to the particular facts and circumstances at hand, our courts have remarked as to certain differences between litigation and transactional matters. See, *e.g.*, *Goldstein v. DABS Asset Manager, Inc.*, 381 Ill. App. 3d 298, 304 (2008) ("In a transactional setting, the statute of repose may cut off a malpractice action before it accrues."); *Fricka*, 309 Ill. App. 3d at 87 (where court noted that a malpractice plaintiff who is injured in a litigation setting will not often be impacted by the statute of repose, while the statute of repose may cut off suits arising in the transactional setting); *Trogi*, 362 Ill. App. 3d at 98 (where the court distinguished the holding in *Hester v. Diaz*, 346 Ill. App. 3d 550, 554 (2004), in part, because that case involved malpractice in the context of litigation). See also *Union Planters Bank, N.A. v. Thompson Coburn LLP*, 402 Ill. App. 3d 317, 344 (2010) (where court compared proof of damages in a litigation malpractice case with a transactional one).

¶ 38    However, the plain language of section 3-214.3 makes no distinction in its application as to types of malpractice. Rather, by its plain terms, the section applies to "[a]n action for damages based on tort, contract, or otherwise *** against an attorney arising out of an act or omission in the performance of professional services." 735 ILCS 5/13-214.3(b) (West 2014). The statute contains no limiting language as to an "act," or "omission," or "performance of professional services," which may form the basis of the legal malpractice action. "It is improper for a court to depart from the plain statutory language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent." *Bettis v. Marsaglia*, 2014 IL 117050, ¶ 13 (citing *Metropolitan Life Insurance Co. v. Hamer*, 2013 IL 114234, ¶ 18). We cannot read the statute of repose as having differing rules of application depending on whether the negligent misconduct takes place in a transactional or a litigation setting. Therefore, the statute of repose as to any legal malpractice case "begins to run as soon as an event creating the malpractice occurs, regardless of whether an injury has yet resulted so as to cause an action to accrue." *Mauer*, 401 Ill. App. 3d at 639.

¶ 39    We disagree with Terra's argument that *Lamet* should be considered as setting forth solely a "statute of repose rule for *litigation* malpractice." (Emphasis in original.) The defendant in *Lamet* began representing the plaintiff in 1994 as to a dispute with his landlord. *Lamet*, 2015 IL App (1st) 143105, ¶ 4. The litigation covered 17 years and was settled in 2011 after the plaintiff learned that the claims and affirmative defenses that had been asserted against his landlord by the defendant on his behalf "were 'likely indefensible.' " *Id.* ¶ 9. The plaintiff's malpractice suit, which was filed in 2011, was dismissed as untimely under the statutes of limitations and repose. *Id.* ¶¶ 11, 14. On appeal, we rejected the plaintiff's argument that the statute of repose began to run on June 10, 2011, when the defendant "filed his final version of [the] affirmative defenses." *Id.* ¶¶ 19-20. We found, instead, that the statute of repose began to run in 1994, at the outset of the representation when the defendant failed to inform the plaintiff that he had no meritorious defenses, claims, or remedies, notwithstanding the defendant's "later failure to correct that omission." *Id.* ¶ 23.

¶ 40    As alleged in Terra's complaint, the event from which Terra's injuries flowed was the execution of the first amendment which contained the agreement that the method to measure the retail parcel was to be BOMA 96, without the exclusionary language. As in *Lamet*, this is

the event from which the injuries flowed, notwithstanding DLA's subsequent failures to correct the issue prior to the closing.

¶ 41    The discussion in *Lamet* upon which Terra relies does not require a different holding in this case. We did say in *Lamet* that, in the transactional context, the overt act from which the injury flows "will *typically* be the date upon which the transaction is executed and the negligence is complete," while in the litigation context the negligent act can occur before the end of litigation and the representation has ended. (Emphasis added.) *Id.* ¶ 25. Our statements, as to when the negligent act generally occurs in a transactional case and a litigation case, should not be read as a bright line rule that, in a transactional setting, the statute of repose always begins to run when the attorney's representation ends.

¶ 42    Similarly, while in *Snyder* and *Trogi* the statute of repose was found to have been triggered upon a negligent act that also happened to be the last act of representation, that fact does not require a finding in this case that the statute of repose did not began to run until the closing, simply because that is when DLA's representation of Terra as to the sale ended.

¶ 43    In *Snyder*, the plaintiff's husband retained the defendant attorney in 1997 to prepare a deed conveying the marital home to the plaintiff and her husband as joint tenants with the right of survivorship. *Snyder*, 2011 IL 111052, ¶ 3. After the husband died in 2007, the plaintiff learned that the property was held by a trustee in a land trust and that her stepson was the sole beneficiary. In 2008, she brought a malpractice action against the defendant. *Id.* ¶¶ 2-3. The defendant's motion to dismiss the plaintiff's suit as untimely was granted. *Id.* ¶ 5. Before our supreme court, the defendant argued that the "injury" occurred not when the husband died but when the deed was prepared. *Id.* ¶ 12. The plaintiff agreed that "an injury did occur" when the deed was prepared but maintained that another injury occurred when the husband died and she did not have a surviving interest in the property. *Id.* The plaintiff further contended that it was the "last injury that determines when the limitations period began to run." *Id.*

¶ 44    These arguments related to whether section 13-214.3(d), which allows suit to be commenced two years after the client's death, applied to make the *Snyder* action timely and not the two-year statute of limitations of section 13-214.3(b), which would render the action untimely. A determination as to the applicability of section 13-214.3(d) turns solely on whether the injury caused by the malpractice occurred upon the death of the client. *Id.* ¶ 13 (citing *Peterson v. Wallach*, 198 Ill. 2d 439 (2002)). In contrast, the statute of repose does not run from an "injury," but rather from an act or omission. 735 ILCS 5/13-214.3(c) (West 2014).

¶ 45    Thus, our supreme court concluded in *Snyder* that "[s]ince the injury in this case occurred at the time the deed was prepared and executed, the two-year limitations period contained in subsection (b) of the statute applies." *Snyder*, 2011 IL 111052, ¶ 17. The court, however, then addressed the statute of repose by first noting that "[t]he period of repose in a legal malpractice case begins to run on the last date on which the attorney performs the work involved in the alleged negligence." *Id.* ¶ 18 (citing *Carlen v. First State Bank of Beecher City*, 367 Ill. App. 3d 1051, 1056 (2006), and *Trogi*, 362 Ill. App. 3d at 96). The court concluded that the statute of repose began to run at the time the improperly recorded deed was mailed, as that was the "last act of defendant's representation." *Id.* The plaintiff's suit was, therefore, untimely. *Id.*

¶ 46    Again, we conclude that the language in *Snyder* that the statute of repose in that case began to run with the last act of representation—preparation and delivery of the deed—should not be read to mean that, in every transaction, the statute of repose for a malpractice action begins on the last day or act of representation. As we stated in *Lamet,* this language "was not being used

- 9 -

in *Snyder* to extend the period of repose. On the contrary, it was used to show that the *Snyder* plaintiff's suit was clearly past the period of repose. The *Snyder* defendant's delivery of the defective deed was a 'single overt act from which subsequent damages may flow' [citation], thus triggering the start of the period of repose." *Lamet*, 2015 IL App (1st) 143105, ¶ 25. In this case, the execution of the first amendment was the last date on which DLA performed "the work involved in the alleged negligence" (*Snyder*, 2011 IL 111052, ¶ 18) and was the conduct from which the damages flowed (*Lamet*, 2015 IL App (1st) 143105, ¶ 25).

¶ 47    The attorney in *Trogi* negligently recorded a deed transferring ownership to the plaintiff from his daughter in the wrong county in October 1998 and mailed the improperly recorded deed to the plaintiff in late December 1998. *Trogi*, 362 Ill. App. 3d at 94. The daughter transferred the property to a third party in 2003, and because the prior deed was not properly recorded, the plaintiff's interest in the property was extinguished. The plaintiff's malpractice suit against the defendant was filed in November 2004 and was dismissed under the statute of repose. *Id.* at 94-95.

¶ 48    In reviewing the dismissal, the appellate court cited the holding in *Frika* that the attorney malpractice period of repose begins to run on the last date on which the attorney performs the work involved in the alleged negligence. *Id*. at 96. The dismissal in *Trogi* was reversed, based on a finding that the sending of the improperly recorded deed to the plaintiff was the defendant's last act of negligence as to the improper recording of the deed, an act which "*coincided* with the termination of the attorney-client relationship." (Emphasis added.) *Trogi*, 362 Ill. App. 3d at 98. Here although it did not coincide with the termination of the attorney-client relationship, the last act of negligence from which the damages flowed was that associated with the agreement to use BOMA 96, without the exclusionary language, which occurred upon the execution of the first amendment by Terra and NM Project on May 29, 2007.

¶ 49    Our rejection of Terra's position—that in a transaction malpractice case the statute of repose does not run until the last act of representation as to the entire matter—is consistent with our case law that "the statute of repose is not tolled merely by the continuation of the attorney-client relationship" (*Lamet*, 2015 IL App (1st) 143105, ¶ 20 (citing *Mauer*, 401 Ill. App. 3d at 640)), nor "by the attorney's ongoing duty to correct past mistakes" (*id.* (citing *Frika*, 309 Ill. App. 3d at 84)).

¶ 50    In the alternative, Terra argues that DLA's "work" on the measurement of the retail parcel "did not end, at least, until the execution of the March 2010 [letter]." According to Terra, the March 2010 letter "should be considered as the last act of negligence." As noted above, the March 2010 letter did include agreements as to the retail parcel and its measurements. However, we do not agree that the statute of repose began to run with the March 2010 letter.

¶ 51    As we have stated, the statute of repose in a legal malpractice case begins to run as soon as the event giving rise to the claim occurs (*Mauer*, 401 Ill. App. 3d at 639) and is not tolled merely by the continuation of the attorney-client relationship (*id.* at 640; *Lamet*, 2015 IL App (1st) 143105, ¶ 20; *Sorenson v. Law Offices of Theodore Poehlmann*, 327 Ill. App. 3d 706, 710 (2002)). Therefore, even if DLA failed to include the exclusionary language in the March 2010 letter, the statute of repose began to run with the execution of the first amendment in May 2007. "[W]here there is a single overt act from which subsequent damages may flow, the statute begins to run on the date the defendant invaded the plaintiff's interest and inflicted injury, and this is so despite the continuing nature of the injury." *Feltmeier*, 207 Ill. 2d at 279.

The acts and omissions of DLA as to the drafting and execution of the first amendment gave rise to this claim, and the statute of repose was not tolled by any failure to include the exclusionary language in the March 2010 letter.

¶ 52 Finally, Terra argues that "DLA could and should have placed the [e]xclusionary [l]anguage in several post-2007 [agreements] and its failure to include the term in any of these documents is what proximately caused Terra's injury." Terra contends that this argument neither encroaches on the rule that continuous representation does not toll the statute of repose, nor can it be viewed as an argument that DLA failed to correct the omission of the exclusionary language in the first amendment. We disagree.

¶ 53 In essence, Terra argues that as its attorney for the negotiations and at the closing, DLA had a continuing duty to correct the injuries which flowed from the first amendment. However, the failure to include the exclusionary language in the agreements did not exacerbate the injuries which were caused by the execution of the first amendment or cause different injuries. The period of repose is not tolled by DLA's subsequent failures to correct the omission of the exclusionary language in the first amendment. See *Mauer*, 401 Ill. App. 3d at 642 (ongoing duty to correct does not delay beginning of period of repose (citing *Fricka*, 309 Ill. App. 3d at 84)).

¶ 54 Because we hold that Terra's suit is time-barred under the statute or repose, we need not address the issue of whether the suit was untimely under the statute of limitations. See *Lamet*, 2015 IL App (1st) 143105, ¶ 28 (where court declined to consider statute of limitations after finding the statute of repose barred the suit).

¶ 55 Terra next argues that the circuit court erred in denying its oral motion to amend its complaint to plead independent acts of malpractice as to the failure to include the exclusionary language in the agreements that were executed between 2007 and 2012, which would fall within the six-year statute of repose.

¶ 56 Section 2-616(a) of the Code (735 ILCS 5/2-616(a) (West 2014)), provides that "[a]t any time before final judgment amendments may be allowed on just and reasonable terms *** which may enable the plaintiff to sustain the claim for which it was intended to be brought or the defendant to make a defense or assert a cross claim." The decision to grant a motion to amend pleadings is within the discretion of the circuit court, and a reviewing court will not reverse the circuit court's decision absent an abuse of discretion. *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 57 Typically, in reviewing the denial of a motion to amend, the reviewing court considers whether (1) the proposed amendment would cure the defective pleading, (2) the proposed amendment would surprise or prejudice the opposing party, (3) the proposed amendment was timely filed, and (4) the moving party had previous opportunities to amend. *Id.* However, a number of courts have recognized that these so-called *Loyola Academy* factors "apply only to amendments that have been proposed prior to final judgment." *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 14; *Hachem v. Chicago Title Insurance Co.*, 2015 IL App (1st) 143188, ¶ 18; *Compton v. Country Mutual Insurance Co.*, 382 Ill. App. 3d 323, 332 (2008) (same). After final judgment, a party has no statutory right to amend a pleading under section 2-616(a) of the Code; rather, a party may only amend a pleading to conform the pleadings to the proofs under section 2-616(c). *Compton*, 382 Ill. App. 3d at 332. Because in this case Terra only requested to amend its complaint after the trial court dismissed it with prejudice, under this line of authority the trial court did not err in denying that request. See

*Hamer*, 2014 IL App (1st) 131005, ¶ 14 (noting that "[a]fter final judgment, a plaintiff has no statutory right to amend a complaint and a court commits no error by denying a motion for leave to amend"); *Hachem*, 2015 IL App (1st) 143188, ¶ 18 (noting that it is well settled that the dismissal of a cause of action constitutes a final judgment).

¶ 58    Nevertheless, even if we declined to follow this line of authority and found that application of the *Loyola Academy* factors was appropriate here, we find that Terra's proposed amendment to the complaint would not have cured the defect. The complaint was dismissed as time-barred because the statute of repose began to run at the execution of the first amendment. As we have found, the statute of repose was not tolled by DLA's continued representation of Terra and its failure to include the exclusionary language in the agreements, including those executed between 2007 and 2012. The circuit court properly denied Terra's request to amend the complaint.

¶ 59                                    III. CONCLUSION

¶ 60    For the reasons stated above, we find that the statute of repose barred Terra's action for legal malpractice against DLA, and the proposed amendment to the complaint would not have cured this defect. Therefore, we affirm both the circuit court's dismissal of the complaint with prejudice and its denial of leave to file an amended complaint.

¶ 61    Affirmed.