2020 IL App (1st) 191735

No. 1-19-1735

Fourth Division
Modified opinion filed November 25, 2020

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| LOUIS HERMANSEN and CHERYL HERMANSEN, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | Appeal from the Circuit Court |
| | ) | of Cook County. |
| v. | ) | |
| | ) | No. 16 L 007654 |
| JAMES J. RIEBANDT; LEE F. DEWALD; LESTER A. | ) | |
| OTTENHEIMER, III; RIEBANDT & DEWALD, PC; | ) | The Honorable |
| DEWALD LAW GROUP, PC; OTTENHEIMER LAW | ) | Thomas R. Mulroy, Jr., |
| GROUP, LLC; and OTTENHEIMER ROSENBLOOM, | ) | Judge Presiding. |
| LLC, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Hall and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1    The instant appeal arises from the trial court's grant of summary judgment in favor of

defendants James J. Riebandt, Lee F. DeWald, and Lester A. Ottenheimer, III, and their

related law firms, in connection with a legal malpractice action filed against them by

plaintiffs Louis and Cheryl Hermansen. Plaintiffs' lawsuit alleges that defendants failed to

properly inform them of the risks of litigating the propriety of a mortgage lien on their

residence, leading them to reject several settlement offers in reliance on defendants' advice

and resulting in an adverse judgment against them. The trial court granted defendants' motion for summary judgment in the malpractice litigation, finding that the applicable statute of limitations and statute of repose barred plaintiffs' claims. Plaintiffs appeal, and for the reasons that follow, we reverse.

¶ 2                                    BACKGROUND

¶ 3                                    I. Complaint

¶ 4      On August 2, 2016, plaintiffs filed a complaint for legal malpractice against defendants. The complaint alleges that plaintiffs were the owners of C to C Imports, Inc. (CTC), a corporation that owned a parcel of real property in Elk Grove Village (commercial property). In connection with the commercial property, plaintiffs had signed two notes for a combined $1,266,724.53, which were secured by two mortgages and two guaranties, all with Bank of America.

¶ 5      In 2009, plaintiffs sought to sell the commercial property and retained Riebandt to represent them for that purpose. In August 2009, Riebandt informed plaintiffs that a prospective buyer had offered to purchase the commercial property for $1.25 million. After the application of closing costs, the proposed sale proceeds were $99,024.38 less than the amount of plaintiffs' outstanding obligations on the Bank of America notes. As a result, Riebandt negotiated with Bank of America, after which he informed plaintiffs that Bank of America would permit the sale of the commercial property and release its mortgage interests in the property, provided that plaintiffs would agree to (1) tender the net sale proceeds of $1,154,380.01 to Bank of America upon closing and (2) execute a guaranty for the $99,024.38 deficiency. On August 11, 2009, in reliance on Riebandt's representations,

plaintiffs signed a real estate sale agreement with the prospective buyer for $1.25 million, with the closing scheduled for September 11, 2009.

¶ 6    On August 18, 2009, Riebandt contacted Bank of America about the execution of the sale contract, and Bank of America responded by forwarding to Riebandt three agreements: (1) a forbearance agreement, (2) a new note in the amount of $99,024.38, and (3) a new mortgage securing repayment on the new note. Under the terms of the forbearance agreement, Bank of America agreed to forbear legal action on the outstanding notes and mortgages until after the September 11, 2009, closing on the sale of the commercial property in exchange for plaintiffs' execution of the new note and new mortgage, which authorized Bank of America to record a mortgage lien on plaintiffs' personal residence in Elk Grove Village. However, the documents did not contain any restrictions or contingencies conditioning the validity and enforceability of the new note and mortgage on the successful closing of the sale of the commercial property.

¶ 7    On August 20, 2009, Riebandt presented plaintiffs with the Bank of America documents, but did not discuss the risks or benefits of executing them and simply instructed plaintiffs to sign the documents, which they did. Riebandt then tendered the executed documents to Bank of America, which recorded the mortgage lien against plaintiffs' personal residence on August 27, 2009, prior to any closing on the sale of the commercial property. On September 2, 2009, the prospective buyer informed Riebandt that it was terminating the contract, and the sale of the commercial property never closed. Plaintiffs' obligations under the original notes and mortgages were not released by Bank of America, and plaintiffs never received the $99,024.38 from Bank of America under the new note. Riebandt did not discuss with

plaintiffs any impact of the failed closing on their obligations under the new note and mortgage.

¶ 8        Plaintiffs were not informed that Bank of America had recorded a mortgage lien against their personal residence until January 2011. Bank of America never issued any statements or demands to plaintiffs seeking repayment of the $99,024.38 obligation to Bank of America at any time in 2009, 2010, or 2011.

¶ 9        The complaint alleged that from September 2009 through 2013, Riebandt and DeWald, through their law firms, served as counsel for plaintiffs in several real estate related matters, including the sale of the commercial property, the sale of plaintiffs' personal residence, and in connection with several lawsuits filed by Bank of America against plaintiffs and CTC, their company, concerning the notes, mortgages, and guaranties on the commercial property.

¶ 10       As relevant to the instant lawsuit, on February 1, 2011, Riebandt and DeWald obtained a "Track Search Report" from Fidelity National Title Insurance Company (Fidelity), which showed claims or encumbrances on the title to plaintiffs' personal residence. The report showed that Bank of America had recorded a mortgage lien on August 29, 2009, to secure an indebtedness of $99,024. Accordingly, the complaint alleges that, "[a]s of February 1, 2011, or shortly thereafter, defendants Riebandt or DeWald, or both of them, knew or reasonably should have known" that Bank of America had recorded the mortgage. Riebandt and DeWald did not show the report to plaintiffs or discuss it with them.

¶ 11       In March 2011, Riebandt and DeWald represented plaintiffs in connection with a proposed sale of the commercial property. The proposed buyer offered to purchase the commercial property for $632,500. However, the commercial property was still subject to two mortgage liens and *lis pendens* liens arising from Bank of America's still-pending

4

lawsuits against plaintiffs and CTC. Consequently, plaintiffs required Bank of America's consent to the transaction. Bank of America required plaintiffs to execute a "Mortgage Release Agreement," which plaintiffs did. The sale successfully closed, Bank of America released its mortgage interests in the commercial property, and all net proceeds from the sale ($469,458.17) were tendered to Bank of America.

¶ 12 Riebandt selected Fidelity to provide title insurance and escrow services for the sale of plaintiffs' commercial property, but unbeknownst to plaintiffs, Riebandt had a preexisting principal-agent relationship with Fidelity whereby Riebandt and Fidelity agreed to share monies paid for the title services provided by Fidelity in real estate sales transactions referred to Fidelity by Riebandt. Plaintiffs were never offered a choice of title insurers and were not informed of the conflict of interest presented by Riebandt's relationship with Fidelity. In the case of the sale of the commercial property, Riebandt received $1664 of the $3430 Fidelity charged for its title services.

¶ 13 By May 2011, plaintiffs had personal and corporate debt obligations in excess of $1 million and sought Riebandt's advice. Riebandt recommended that plaintiffs consider seeking bankruptcy protection and referred them to Lester Ottenheimer, a bankruptcy attorney. Plaintiffs retained Ottenheimer to provide them advice and assistance with their debt obligations, and he recommended that plaintiffs file for Chapter 7 bankruptcy relief. Plaintiffs instructed Riebandt and DeWald to provide Ottenheimer "with all materials as might bear upon or relate to the plaintiffs' financial circumstances, assets and debts, so as to assist and enable Mr. Ottenheimer's preparation of the Chapter 7 Bankruptcy Petition and related disclosures." Riebandt and DeWald provided Ottenheimer with documents, including

a copy of the track search report showing the August 2009 recording of Bank of America's mortgage lien on plaintiffs' personal residence.

¶ 14     On May 31, 2011, Ottenheimer prepared and filed a petition with the United States Bankruptcy Court for the Northern District of Illinois, seeking complete discharge of all debts under Chapter 7 of the United States Bankruptcy Code. The Bank of America note and mortgage were not listed or disclosed in the bankruptcy petition.

¶ 15     During the pendency of the bankruptcy proceedings, Ottenheimer negotiated with the primary mortgageholder on plaintiffs' personal residence, CitiMortgage, and advised that plaintiffs desired to remain in their residence. Ottenheimer agreed not to seek discharge of plaintiffs' obligations to CitiMortgage. On September 13, 2011, the bankruptcy court entered a discharge order, which discharged plaintiffs' disclosed debts. The discharge order did not discharge plaintiffs' obligations to CitiMortgage, by agreement, and did not discharge plaintiffs' obligations under the Bank of America note and mortgage, which had never been disclosed in the bankruptcy petition.

¶ 16     On January 25, 2012, CitiMortgage sought to foreclose on plaintiffs' mortgage, and Riebandt and DeWald agreed to represent plaintiffs in that litigation. Riebandt recommended that plaintiffs sell their personal residence to avoid foreclosure, and plaintiffs agreed. Plaintiffs hired a realtor to assist them with the sale and, in late January 2012, the realtor informed them that a title search revealed the existence of the August 2009 Bank of America mortgage lien.

¶ 17     Between February and May 2012, plaintiffs engaged e-mails with Riebandt in which they asked him to provide them with information about the Bank of America mortgage lien. Riebandt "repeatedly assured" plaintiffs that, while there was a record of a mortgage lien,

"any such mortgage lien was not valid." Riebandt informed plaintiffs that Bank of America could not have recorded a valid mortgage lien in August 2009 because any obligations arising from plaintiffs' execution of the Bank of America note, mortgage, and forbearance agreement had been conditioned on a successful closing of the sale of the commercial property, which would have resulted in the $99,024.38 deficiency. Riebandt explained that, since the transaction never closed, there was no " 'shortfall' " of $99,024.38, so there were no obligations to Bank of America other than the original notes, mortgages, and guaranties on the commercial property, which had been discharged in bankruptcy. Riebandt "assured Plaintiffs that he would take steps to ensure" that the mortgage lien would not prevent plaintiffs from selling their personal residence. The complaint alleges that "[p]laintiffs reasonably relied upon and accepted this assurance from defendant Riebandt and so continued to market the Personal Residence for sale while looking for a new home to purchase with the anticipated net sale proceeds of the sale of the Personal Residence."

¶ 18        Plaintiffs followed up with Riebandt periodically in February, March, April, and May 2012. Each time, Riebandt reported that he had not been able to make any progress in resolving the lien interest. The complaint alleges that Riebandt variously characterized the mortgage lien as "a 'rogue mortgage,' a 'mistake by [Bank of America]' or a mistaken belief by [Bank of America] that plaintiffs could somehow owe [Bank of America]" $99,024.38 on a note where the transaction never closed, no deficiency ever resulted, and plaintiffs had never received any funds from Bank of America. The complaint alleges that "[p]laintiffs reasonably relied upon the assurance of Riebandt" and, in June 2012, signed a contract for the sale of their personal residence, with the closing to proceed on June 29, 2012. Plaintiffs also entered into negotiations for the purchase of a new home in Algonquin.

¶ 19       On June 28, 2012, the day before the closing on the sale of plaintiffs' personal residence, Riebandt informed plaintiffs that Bank of America refused to release the mortgage lien. Plaintiffs asked Riebandt what could be done, and Riebandt responded that he had " 'connections' " that would permit the closing to proceed as scheduled. Riebandt advised that he could have the title insurer provide a policy insuring over the mortgage lien, but that plaintiffs would need to permit him to set aside $99,024.38 into an escrow account, where it would remain until he could secure the release of the mortgage lien. As the net proceeds of the sale were anticipated to be approximately $214,000, plaintiffs agreed to permit Riebandt to set aside $99,024.38, which would still allow them approximately $115,000 to apply toward the purchase of the new home. On the same day, Riebandt forwarded closing documents to plaintiffs, which they signed and returned. The closing proceeded the next day; plaintiffs were not present, but Riebandt represented them at the closing and signed one or more of the closing documents as their " 'attorney in fact.' "

¶ 20       As with the commercial property, Fidelity was chosen to be the title insurer for the sale of plaintiffs' personal residence. Plaintiffs did not have a choice of title insurers and were unaware of Riebandt's preexisting relationship with Fidelity. One of the closing documents signed by Riebandt on plaintiffs' behalf was an "Indemnity and Security Agreement with Deposit of Funds to Protect and Secure Against Exceptions to Title" (indemnity agreement). Under the indemnity agreement, plaintiffs were required to tender the entirety of the net proceeds from the sale of their personal residence as indemnity and security for Fidelity's agreement to insure over the Bank of America mortgage lien. Plaintiffs were never shown the indemnity agreement prior to closing and did not authorize Riebandt to sign it. After the

closing, the entirety of the net proceeds from the sale ($214,281.95) was placed in a Fidelity-controlled escrow account.

¶ 21    Within a day of the closing, plaintiffs contacted Riebandt and inquired as to when they would receive the net proceeds from the sale, other than the $99,024.38 that they had authorized to be placed into escrow. Riebandt informed them that Fidelity required that the entirety of the net proceeds be placed into escrow in order for the closing to proceed and advised them that Ottenheimer "would be taking the lead in further negotiations" with Bank of America. Plaintiffs contacted Ottenheimer and requested that he resume negotiations with Bank of America immediately, as they were paying rent on a month-to-month basis for a house that they sought to purchase using the proceeds from the sale of their personal residence.

¶ 22    On September 11, 2012, Ottenheimer sent a letter to Bank of America's attorney, claiming that the August 2009 forbearance agreement was " 'void' " after the sale of the commercial property did not close and demanding that Bank of America immediately release its mortgage lien. On September 20, 2012, Bank of America's attorney responded and offered to settle the dispute by releasing plaintiffs' obligations in return for payment of $99,024.38. Ottenheimer responded to Bank of America that its offer was a " 'nonstarter' or 'nonsense' " because plaintiffs' obligations to Bank of America had been discharged by bankruptcy. The complaint alleges that, on the same day, "Ottenheimer informed plaintiffs of [Bank of America's] settlement offer. Ottenheimer advised that the [Bank of America] offer was 'nonsense' due to the bankruptcy court's discharge order and that the plaintiffs['] only option was to go to court, file an emergency motion and obtain a temporary restraining order or injunction against [Bank of America]."

¶ 23    Plaintiffs followed up with Riebandt and DeWald about the Bank of America offer and Ottenheimer's advice, and Riebandt and DeWald advised plaintiffs that they agreed with Ottenheimer's assessment and that they would prepare a complaint against Bank of America to obtain a judicial declaration that plaintiffs did not owe anything under the note and that Bank of America did not have a valid mortgage interest. The complaint alleges that "[d]efendants Riebandt and DeWald assured plaintiffs that [Bank of America's] legal position was weak and that if plaintiffs authorized them to pursue litigation against [Bank of America] the plaintiffs would be able to recover their reasonable attorneys' fees and costs in the lawsuit." According to the complaint, "[p]laintiffs relied upon the advice and assurances of defendants Ottenheimer, Riebandt and DeWald and authorized defendants to prepare and file a lawsuit against [Bank of America]."

¶ 24    On October 15, 2012, DeWald filed a complaint for declaratory judgment on plaintiffs' behalf, alleging that the forbearance agreement, note, and mortgage were unenforceable because they were conditioned on the successful closing of the commercial property sale. On October 23, 2012, Bank of America's attorney communicated with DeWald and extended a second offer to settle the case. Bank of America offered to release plaintiffs from any liability under the note and to release the mortgage lien in exchange for plaintiffs' payment of half of the note's principal, or $49,512.19.

¶ 25    DeWald passed along Bank of America's offer to plaintiffs. DeWald did not discuss the risks and benefits of accepting or rejecting the offer, but instead recommended that plaintiffs reject the settlement offer and litigate the declaratory judgment action. The complaint alleges that "DeWald again assured the plaintiffs that [Bank of America's] legal position was weak, [and] that it was DeWald's judgment that plaintiffs' best interests were served by prosecution

of the [declaratory judgment] Action. Mr. DeWald emphasized that doing so was essentially without cost to plaintiffs because they would be able to recover their reasonable attorneys' fees and costs upon winning the [declaratory judgment] Action against [Bank of America]." According to the complaint, "[p]laintiffs relied on Mr. DeWald's representations, informed him that they wished to follow his advice and that he should press forward with winning the case."

¶ 26     The declaratory judgment action was litigated for the next three years. Bank of America denied the allegations of the complaint and filed a counterclaim seeking the recovery of the $99,024.38, plus default and other accrued interest, attorney fees, and costs. On March 25, 2012, the trial court in the declaratory judgment action entered judgment in Bank of America's favor, finding the note and mortgage to be valid and enforceable. Bank of America offered to terminate the litigation in exchange for mutual releases and plaintiffs' forfeiture of the entire $214,281.95 that plaintiffs had received from the sale of their personal residence. Bank of America advised that continuing to litigate the matter, either by litigating Bank of America's counterclaim or through appeal, would cause Bank of America to incur further attorney fees, which it would then seek from plaintiffs. DeWald advised plaintiffs to "settle for any amount that he might be able to get from [Bank of America] because the possibility that [Bank of America] would win on its counterclaim or on appeal, incur more fees and recover them from plaintiffs was more likely than not." Plaintiffs authorized DeWald to complete the settlement on the best terms that could be negotiated. Ultimately, DeWald negotiated a settlement agreement with Bank of America, which included Fidelity as a party, and on December 9, 2015, Fidelity released the funds held in escrow as follows: $181,500 to Bank of America, $8153.32 to Fidelity, and $24,628.63 to plaintiffs as net

proceeds from the sale of their personal residence. Bank of America, in turn, provided a release of the note and mortgage. On December 15, 2015, the declaratory judgment complaint was dismissed pursuant to settlement.

¶ 27 The complaint set forth counts of six counts of legal malpractice, one count against Riebandt, DeWald, and Ottenheimer individually, and three counts against their law firms. The count against Riebandt alleged that he was negligent in (1) his conduct surrounding the 2009 failed closing of the sale of the commercial property; (2) failing to disclose his relationship with Fidelity; (3) failing to obtain plaintiffs' informed consent prior to signing the Fidelity indemnity agreement, which resulted in the entirety of the net proceeds from the sale of their personal residence being held in escrow; (4) failing to inform plaintiffs of the risks of proceeding to litigation against Bank of America, including the rejection of multiple settlement offers; and (5) negligently advising plaintiffs as to the validity of the Bank of America mortgage lien. The count against DeWald contained similar allegations. The count against Ottenheimer contained similar allegations as to Ottenheimer's failure to inform plaintiffs of the risks of pursuing litigation against Bank of America and also alleged that Ottenheimer negligently advised plaintiffs as to the effect of the bankruptcy on their obligations to Bank of America.

¶ 28 On January 3, 2017, defendants Riebandt and DeWald filed a combined answer and affirmative defenses, and DeWald's law firm also filed a counterclaim for breach of contract against plaintiffs, seeking $24,586 allegedly owed by plaintiffs for attorney fees. On April 26, 2017, after the denial of a motion to dismiss, defendant Ottenheimer filed an answer and affirmative defenses. On June 5, 2018, Ottenheimer filed a counterclaim for contribution against Riebandt and DeWald, in the event that he was found liable under plaintiffs'

12

complaint. In their answer to the counterclaim, Riebandt and DeWald also asserted a counterclaim for contribution against Ottenheimer.

¶ 29                              II. Motions for Summary Judgment

¶ 30                                     A. Motions

¶ 31      On October 12, 2018, Ottenheimer filed a motion for summary judgment, claiming that any damages that plaintiffs allegedly suffered were not caused by Ottenheimer, but by Riebandt and DeWald.

¶ 32      On October 25, 2018, Riebandt and DeWald filed a joint motion for summary judgment, claiming that plaintiffs' claims were time-barred and that they were shielded from liability because they were merely exercising their judgment as to an unsettled question of law.

¶ 33                                  B. Relevant Exhibits

¶ 34                                   1. Party Depositions

¶ 35                                a. Plaintiff Louis Hermansen

¶ 36      In his discovery deposition, plaintiff testified consistently with the allegations set forth in the complaint. After being provided a copy of a February 3, 2011, letter, plaintiff testified that Riebandt and DeWald sent him a copy of the tract search report, on which the 2009 Bank of America mortgage lien was listed. However, plaintiff had no recollection of receiving such a letter, which was unsigned. Plaintiff testified that he became aware of the existence of the mortgage lien in 2012, when a real estate broker informed him of it. Plaintiff reached out to Riebandt, DeWald, and Ottenheimer to "find[ ] out what this was." Ottenheimer informed plaintiff that he would investigate and wrote a letter to Bank of America's attorney. When plaintiff followed up, Ottenheimer "told us that a lawsuit would be necessary because he felt the note and lien were discharged with the bankruptcy and that he felt the forbearance

agreement was not enforceable due to the fact that that transaction with [the prospective buyer] did not complete." Ottenheimer further told plaintiff "he felt the forbearance agreement was nonsense and that they had no standing in there, in court, and that it would be to our benefit to sue and not settle with them." Plaintiff testified that Ottenheimer specifically represented to him that the lawsuit would be successful. Plaintiff also testified that Riebandt, DeWald, and Ottenheimer advised him not to accept Bank of America's initial settlement offer.

¶ 37    Plaintiff testified that, in a July 16, 2014, e-mail to DeWald, he said that " '[m]aybe we should consider going after [Riebandt],' " because the lawsuit was not leading anywhere. He testified that he "didn't know" whether he meant a lawsuit against Riebandt, and "[t]hat's why I asked [DeWald] for his opinion as to what to do." Plaintiff testified that, at that point, they realized that there had been a mistake in the forbearance agreement, and "our question was what rights do we have to try to correct this."

¶ 38    Plaintiff testified that at no point did any of his attorneys—Riebandt, DeWald, or Ottenheimer—ever inform him that there was a risk that they could lose the Bank of America lawsuit or that a loss could result in plaintiffs being required to pay default interest and attorney fees. Plaintiff testified that, had he been so informed, he would have taken one of Bank of America's settlement offers.

¶ 39                      b. Defendant Riebandt

¶ 40    In his discovery deposition, Riebandt testified that he had a principal-agent relationship with Fidelity at the time that plaintiffs sold their commercial property, but did not recall having plaintiffs sign any disclosure agreements related to that relationship prior to their using Fidelity as their title insurer.

¶ 41       Riebandt testified that, when he referred plaintiffs to Ottenheimer in 2011, he "opened up our office files to him" and gave him any documents that Riebandt had concerning plaintiffs, including the tract search report showing the 2009 Bank of America mortgage lien on plaintiffs' personal residence.

¶ 42       Riebandt admitted that he had referred to the Bank of America mortgage as a "rogue mortgage" in 2012, and that he believed that the validity of the mortgage was contingent on the closing on the commercial property, which ultimately failed. Riebandt further testified that there was nothing in the mortgage documents expressly conditioning the validity of the mortgage on a successful closing.

¶ 43       Riebandt testified that, when plaintiffs sold their personal residence, he signed the indemnity agreement with Fidelity on their behalf and testified that he "explained to them what it was." Riebandt admitted that the indemnity agreement was never sent to plaintiffs for their review, but testified that he had informed them that the entirety of the net proceeds would be held in escrow. Riebandt testified that, under the indemnity agreement, if Bank of America sought to foreclose against the new owners of plaintiffs' personal residence, the new owners would turn to Fidelity as the title insurer, and Fidelity would invoke the indemnity agreement, making plaintiffs ultimately responsible for the foreclosure judgment.

¶ 44       Riebandt denied ever advising plaintiffs that filing a lawsuit would provide "fast relief." When provided an e-mail authored by him using that term, Riebandt testified that he "[did not] remember the basis of why [he] said that." Riebandt also denied advising plaintiffs as to the settlement offers, testifying that DeWald and Ottenheimer were in charge of the litigation. Riebandt testified that he never informed plaintiffs that they faced legal exposure

for not only the principal on the Bank of America mortgage, but also default interest and attorney fees.

¶ 45                                    c. Defendant Ottenheimer

¶ 46        In his discovery deposition, Ottenheimer testified that, generally, a note is dischargeable in bankruptcy, but that a consensual lien such as a mortgage is not. Ottenheimer further testified that, while plaintiffs' obligations to Bank of America were not listed in their bankruptcy filing, it did not make a difference, as their obligations under the note were nonetheless discharged and the mortgage lien remained in place. Ottenheimer testified that he did not have a conversation with plaintiffs about the dischargeability of their obligations to Bank of America, as he "either didn't know or [he] missed it, one of the two."

¶ 47        Ottenheimer testified that he became aware of the Bank of America mortgage in February 2012, and that Riebandt indicated that he would handle it. However, plaintiffs contacted Ottenheimer, expressing frustration about Riebandt's inability to obtain the release of the lien, and asked Ottenheimer to contact Bank of America, which he did. Ottenheimer testified that he had conversations with Riebandt and DeWald about whether the mortgage lien should be handled in bankruptcy court or in state court, and Ottenheimer determined that it should not be handled in a bankruptcy court. Ottenheimer testified that he had no involvement in the case after the declaratory judgment lawsuit was filed.

¶ 48        Ottenheimer testified that he was unaware that plaintiffs had executed an indemnity agreement with Fidelity and further testified that, had he known that, he would have urged plaintiffs to negotiate a settlement instead of dismissing Bank of America's initial offer as a "nonstarter." Ottenheimer also testified that he was unaware that Bank of America had offered to split the $99,000 lien amount and, if he had known, he would have recommended

to settle as "my philosophy is you're always better off to settle than to litigate. Because when you litigate, you take a chance; when you settle, you may not be happy, but it's a sure thing and it's done."

¶ 49                          d. Defendant DeWald

¶ 50    In his discovery deposition, DeWald testified that he handled the litigation of plaintiffs' action against Bank of America. DeWald admitted that he did not have a specific basis for requesting attorney fees in the Bank of America litigation and, despite their inclusion in the Bank of America complaint, DeWald denied ever representing to plaintiffs that they would be able to recover their attorney fees. DeWald testified that he discussed the risks and benefits of filing litigation with plaintiffs, but that he believed there were no benefits to foregoing litigation and he was "pretty confident that they could get their money" from filing suit. DeWald denied being aware that Bank of America had offered to settle prior to the filing of the lawsuit. DeWald also denied that Bank of America had offered to split the $99,000 principal amount but instead testified that Bank of America only offered to split the $214,000 of net sale proceeds by allowing plaintiffs to keep $50,000.

¶ 51    DeWald testified that he did not recall advising plaintiffs that filing suit would lead to "fast relief" and that he could not recall why Riebandt would have made that representation to plaintiffs in an e-mail.

¶ 52    DeWald testified that he, Riebandt, and Ottenheimer met with plaintiff Louis Hermansen at Ottenheimer's office in June 2015 to discuss the trial court's adverse ruling in the Bank of America litigation, including the possibility of appeal.

¶ 53                              2. Bank of America Attorney Deposition

¶ 54        In his discovery deposition, Thomas Peckham, an attorney with the law firm representing

Bank of America with respect to the instant transaction, testified that Bank of America

initially offered to settle the matter if plaintiffs paid the principal amount on the note, but that

offer was declined. After plaintiffs filed suit, Peckham had a discussion with DeWald about

Bank of America settling if plaintiffs paid half of the principal amount; Peckham could not

recall if this was a formal offer or merely a discussion, but had no reason to doubt DeWald's

assertion in an e-mail to plaintiffs that it was a formal offer. Finally, there was a third offer in

which Bank of America would permit plaintiffs to keep $50,000 of the net proceeds from the

sale of their personal residence. Peckham testified that all of the offers were declined.

¶ 55        Peckham testified that, after the filing of the declaratory judgment action, Bank of

America filed a motion to dismiss the complaint, which was denied, and that the opinion

denying the motion to dismiss found that the complaint stated a cause of action.

¶ 56                                    3. Parties' Experts[1]

¶ 57                                     a. Plaintiffs' Expert

¶ 58        In her discovery deposition, Mary Robinson, plaintiffs' expert, testified that she was a

practicing attorney and had served as an expert witness in numerous legal malpractice cases.

Robinson was the former administrator of the Attorney Registration and Disciplinary

Commission (ARDC), and her current practice involved representing attorneys in ARDC

proceedings and performing consultation services for legal ethics issues. Robinson opined

---

[1]All of the parties retained experts. However, Riebandt and DeWald did not attach the deposition testimony or written report from their expert to their motion for summary judgment or responses thereto. Accordingly, that expert's opinion is not properly before us.

that defendants had violated their professional obligations by failing to provide sufficient information to enable plaintiffs to make informed decisions as to the litigation.

¶ 59        Robinson also prepared a written report, attached to plaintiffs' response to defendants' motions for summary judgment. In her report, Robinson opined that defendants "failed to meet the standard of care required of them by failing at multiple junctures to give [plaintiffs] the information and explanations they needed to make informed decisions." First, Robinson opined that Riebandt did not properly inform plaintiffs about the risks of executing the Bank of America documents in connection with the 2009 attempted sale of the commercial property. Additionally, Robinson opined that Riebandt was required to inform plaintiffs in 2011 when he first discovered that the mortgage lien had been recorded, and that Ottenheimer should have discussed the implications of the mortgage in advising plaintiffs as to their bankruptcy filing.

¶ 60        Robinson further opined that Riebandt and DeWald had a conflict of interest in challenging the Bank of America mortgage in that they should have first informed plaintiffs that the recording of the mortgage lien had been made possible only by Riebandt's failure to insist on conditioning the recording on a successful closing. Robinson opined that, due to this, Riebandt and DeWald had an interest in resolving the matter in a way that did not reflect adversely on Riebandt's handling of the transaction. Instead, Robinson opined that Riebandt and DeWald "embarked upon the conflicted representation of [plaintiffs] and fell into exactly the concerns that should have forestalled them from doing so." Robinson noted that "[n]ot once did they acknowledge that there was even a possibility that [Bank of America's] position might be found to have merit, and they advised [plaintiffs] to reject settlement offers that would have allowed [plaintiffs] to retain sufficient funds from the proceeds of the sale of

19

their residence to fund the intended purchase of another home." Robinson opined that Ottenheimer "had a less acute but similar concern in that he had failed to notice or advise [plaintiffs] of the existence and significance of [the mortgage] while handling their bankruptcy case, at a time when they could at least have begun the process of challenging the Mortgage."

¶ 61     Robinson also opined that Riebandt's relationship with Fidelity presented a conflict of interest that should have been disclosed to plaintiffs. Robinson opined that, "[w]ithout informing [plaintiffs] of that relationship, Defendant Riebandt proceeded to negotiate an agreement with Fidelity to insure over [the mortgage] in return for [plaintiffs] agreeing not only to escrow the full net proceeds from the sale of their home, but also to indemnify Fidelity as to any and all claims that might be made on Fidelity in connection with any and all exceptions to title and to be responsible for any expenses incurred by Fidelity due to any such claims, while giving Fidelity authority to use the escrowed funds to settle any such claims." Instead of disclosing his relationship with Fidelity, Robinson opined that plaintiffs "authorized Defendant Riebandt to negotiate and even execute pursuant to a power of attorney an agreement with Fidelity under the misapprehension that Defendant Riebandt's loyalty to their interest was uncompromised by any competing obligations to Fidelity or by any personal interests in protecting his ongoing relationship with Fidelity." Robinson noted that "[t]he indemnity agreement left [plaintiffs] bearing the entire risk of a negative outcome in the dispute over [the mortgage], while freezing their entire sale proceeds to secure Fidelity's interest in the transaction. Moreover, the indemnity agreement gave Fidelity unfettered authority, at its sole discretion, to use the escrowed funds to settle any claims."

¶ 62        Robinson further opined that all of the defendants owed the duty to provide adequate and accurate information to plaintiffs to allow them to make informed decisions about how to proceed in the dispute with Bank of America. Robinson opined that the most obvious risk was that they could lose, but, "[a]lthough that risk was obvious, it was a risk that all of the Defendants either denied or understated, with varying degrees of self-interest motivating their advice." Robinson opined that it was also "critical" for plaintiffs "to understand the full extent of their exposure should they lose," as well as the limits of what they could recover if they won. Robinson opined:

> "Without a complete and accurate understanding of the risks of proceeding, the limits on success, and the time that might pass before the dispute could be resolved, [plaintiffs] could not make an informed decision on whether or not to accept either [Bank of America's] September 2012 offer to settle at the amount of the Mortgage principal, or the October 2012 offer to settle for half that amount."

¶ 63                                b. Ottenheimer's Expert

¶ 64        Kenneth Flaxman, Ottenheimer's expert, is a practicing attorney concentrating in commercial litigation and real estate. In his written report,[2] Flaxman opined that the note was discharged in the bankruptcy regardless of whether Ottenheimer included it in the bankruptcy petition, and that the mortgage would not have been discharged even if it had been listed. Flaxman pointed to a February 3, 2011, letter from Riebandt that included a tract search report and noted that Ottenheimer "repeatedly advised" plaintiffs that only notes, and not mortgage liens, could be discharged in bankruptcy. Flaxman opined that Ottenheimer's

---

[2]In his petition for rehearing, Ottenheimer asks us to also consider Flaxman's deposition testimony. However, as Ottenheimer acknowledges, the deposition transcript was not attached to Ottenheimer's motion for summary judgment or any of the briefing on the motion. Accordingly, we consider only the report, which was attached to the motion for summary judgment.

explanations satisfied the standard of care and that plaintiffs knew that any mortgage lien would survive their bankruptcy, even if Ottenheimer did not specifically discuss it.

¶ 65 Flaxman further opined that Ottenheimer's conduct with respect to the settlement negotiations did not breach the standard of care. Flaxman opined that Ottenheimer's September 11, 2012, letter to Bank of America, in which he demanded the release of the lien, included a "settlement position [that] was reasonable, presented a proposition on which reasonable lawyers could disagree, and was reasonable zealous advocacy." In response to Bank of America's offer to settle for $99,000, Flaxman opined that Ottenheimer's characterization of the offer as a " 'non offer' " was not unreasonable, "because the parties were still at the beginning of settlement negotiations, and the offer did not reflect a large enough discount, in light of the arguments that could be made in regards to the meaning and intention of the parties under the forbearance agreement." Flaxman further opined that these comments "do not appear to be statements intended as binding accurate legal propositions, but instead merely statements of what Ottenheimer told the bank as part of Ottenheimer's zealous advocacy to try and provoke a settlement."

¶ 66 Finally, Flaxman opined that it was reasonable for Ottenheimer to take the position that the only option appeared to be pursuing the issue in state court. Flaxman opined that "[g]iven the potential strength of the forbearance interpretation arguments and the failure of anyone to inform Ottenheimer of the Indemnity agreement, Ottenheimer's position appears to have been a reasonable judgment call under the circumstances. Again, the threat of litigation and escalation of a dispute to a litigation posture can be an effective tool for improving upon a settlement."

¶ 67                                      C. Trial Court Ruling

¶ 68          On December 26, 2018, the trial court entered an order granting defendants' motions for summary judgment. The court found that plaintiffs' injuries flowed from defendants' alleged malpractice in connection with the 2009 forbearance agreement. The court found that plaintiff became aware of their damages from the alleged malpractice in February 2012, when they learned that the mortgage lien had been recorded and that "[t]he advice and actions of Defendants are inseparable from the 2009 agreement."

¶ 69          The court found that plaintiffs knew or should have known of their injury in February 2012 even if plaintiffs may not have had actual knowledge of a malpractice cause of action. Consequently, the court found that the statute of limitations began to run in February 2012 or, at the very latest, on July 16, 2014, when plaintiff Louis Hermansen sent an e-mail asking if they "should consider going after [Riebandt]." Therefore, the court found that plaintiffs' August 3, 2016, complaint was time-barred under the statute of limitations. In the alternative, the trial court also found that the case was barred by the six-year statute of repose because the alleged malpractice occurred in 2009 in connection with the negotiation of the forbearance agreement.

¶ 70          The court found that the statute of repose was not tolled due to equitable estoppel. The court found that defendants did not believe that their representations were untrue and, indeed, at least one trial judge agreed with defendants' interpretation of the Bank of America loan documents. Additionally, the court found that defendants did not misrepresent or conceal material facts.

¶ 71          Finally, the court found that defendants' advice to plaintiffs was based on errors of judgment as to an unsettled question of law, not failure to exercise a reasonable degree of

care and skill. The court found that defendants "cannot be faulted for not disclosing what they did not believe."

¶ 72     The court therefore found that the case was time-barred as against Riebandt and DeWald and, by extension, was also time-barred against Ottenheimer. Consequently, the court granted defendants' motions for summary judgment. Plaintiffs filed a motion for reconsideration, which was denied on May 10, 2019. On July 26, 2019, DeWald's counterclaim for attorney fees against plaintiffs was voluntarily dismissed, meaning that all claims against all parties had been decided. This appeal follows.

¶ 73                                              ANALYSIS

¶ 74     On appeal, plaintiffs contend that the trial court erred in granting summary judgment in favor of defendants. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2018). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *XL Specialty Insurance Co. v. Performance Aircraft Leasing, Inc.*, 2019 IL App (1st) 181031, ¶ 62.

¶ 75     "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary

judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). The party moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The movant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 76    In the case at bar, plaintiffs contend that the trial court erred in finding that their complaint was time-barred. Section 13-214.3 of the Code of Civil Procedure (Code) (735 ILCS 5/13-214.3 (West 2014)) sets forth the time limitations for filing a cause of action for legal malpractice. Specifically, section 13-214.3 provides a two-year statute of limitations for any action against an attorney arising out of an act or omission in the performance of professional services, which begins running at the time the person filing the action "knew or reasonably should have known of the injury for which damages are sought." 735 ILCS 5/13-214.3(b) (West 2014). This section "incorporates the 'discovery rule,' which serves to toll the limitations period to the time when the plaintiff knows or reasonably should know of his or her injury." *Snyder v. Heidelberger*, 2011 IL 111052, ¶ 10 (citing *Hester v. Diaz*, 346 Ill. App. 3d 550, 553 (2004)). In most cases, the time at which a party has or should have the requisite knowledge under the discovery rule is a question of fact. *Jackson Jordan, Inc. v.*

*Leydig, Voit & Mayer*, 158 Ill. 2d 240, 250 (1994). "However, '[w]here it is apparent from the undisputed facts *** that only one conclusion can be drawn, the question becomes one for the court,' and can be resolved as a matter of law, making summary judgment on statute of limitation grounds appropriate." *Castello v. Kalis*, 352 Ill. App. 3d 736, 744 (2004) (quoting *Witherell v. Weimer*, 85 Ill. 2d 146, 156 (1981)); see also *Jackson Jordan*, 158 Ill. 2d at 250 (considering statute of limitations issue on summary judgment); *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 358-59 (1995) (same); *AYH Holdings, Inc. v. Avreco, Inc.*, 357 Ill. App. 3d 17, 43 (2005) (same).

¶ 77     Additionally, section 13-214.3 further provides that an action for legal malpractice "may not be commenced in any event more than 6 years after the date on which the act or omission occurred." 735 ILCS 5/13-214.3(c) (West 2014). The purpose of a statute of repose, as found in section 13-214.3(c), "operates to curtail the 'long tail' of liability that may result from the discovery rule." *Snyder*, 2011 IL 111052, ¶ 10 (citing *Sorenson v. Law Offices of Theodore Poehlmann*, 327 Ill. App. 3d 706, 708 (2002)). A statute of repose begins to run when a specific event occurs, regardless of whether an action has accrued. *Snyder*, 2011 IL 111052, ¶ 10. "Thus, a statute of repose is not tied to the existence of any injury, but rather it extinguishes liability after a fixed period of time." *Snyder*, 2011 IL 111052, ¶ 10.

¶ 78     The relevant question in the case at bar is the date from which either the two-year statute of limitations or six-year statute of repose began to run. The trial court found that all of plaintiffs' claims arose from the recording of the 2009 mortgage lien, and that plaintiffs became aware of that mortgage lien by 2012 at the latest, triggering the two-year statute of limitations. Plaintiffs, however, claim that their cause of action did not accrue until the entry of the adverse judgment against them in 2015, making their 2016 complaint timely.

¶ 79      Plaintiffs' claims are based on the "adverse judgment rule," as set forth in *Lucey v. Law Offices of Pretzel & Stouffer, Chtrd.*, 301 Ill. App. 3d 349 (1998). The court in that case noted that "Illinois courts have frequently recognized, either expressly or implicitly, that a cause of action for legal malpractice will rarely accrue prior to the entry of an adverse judgment, settlement, or dismissal of the underlying action in which plaintiff has become entangled due to the purportedly negligent advice of his attorney." *Lucey*, 301 Ill. App. 3d at 356. To prevail on a legal malpractice claim, the plaintiff client must plead and prove that the defendant attorneys owed the client a duty of care arising from the attorney-client relationship, that the defendants breached that duty, and that as a proximate result, the client suffered injury. *Northern Illinois Emergency Physicians v. Landau, Omahana & Kopka, Ltd.*, 216 Ill. 2d 294, 306 (2005). Our supreme court has explained that "[t]he injury in a legal malpractice action is not a personal injury [citation], nor is it the attorney's negligent act itself [citation]. Rather, it is a pecuniary injury to an intangible property interest caused by the lawyer's negligent act or omission." *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306. Thus, for purposes of a legal malpractice action, a client is not considered to be injured until he has suffered a loss for which he may seek monetary damages, and the fact that an attorney may have breached a duty of care is not, in itself, sufficient to sustain a cause of action. *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306. "Even if negligence on the part of the attorney is established, no action will lie against the attorney unless that negligence proximately caused damage to the client. [Citation.] The existence of actual damages is therefore essential to a viable cause of action for legal malpractice. [Citation.]" *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 306-07.

¶ 80   The *Lucey* court explained: "Since it is also possible the former client will prevail when sued by a third party, damages are entirely speculative until a judgment is entered against the former client or he is forced to settle. When uncertainty exists as to the very fact of damages, as opposed to the amount of damages, damages are speculative [citation], and no cause of action for malpractice can be said to exist." *Lucey*, 301 Ill. App. 3d at 355. See also *Northern Illinois Emergency Physicians*, 216 Ill. 2d at 307.

¶ 81   In the case at bar, we agree that plaintiffs' cause of action did not accrue in 2012, when they became aware of the mortgage lien, but in 2015, when an adverse judgment was entered against them in the Bank of America litigation. Plaintiffs have made clear that the alleged negligent conduct for which they are seeking relief is defendants' advice with respect to attempting to remove the mortgage lien. They have made equally clear that they are *not* seeking relief based on any error in negotiating or drafting the Bank of America documents in 2009, nor are they seeking relief based on Ottenheimer's failure to include the Bank of America note and mortgage on their bankruptcy filing.[3] Indeed, Robinson's report and deposition testimony set forth several instances—aside from the execution of the 2009 documents—in which defendants engaged in allegedly negligent conduct. First, Robinson opined that Riebandt owed plaintiffs a duty to inform them when he discovered in 2011 that the mortgage lien had been recorded, so that they had the ability of addressing the lien prior to attempting to sell their home and without the pressure of an imminent closing date. Similarly, Robinson opined that Ottenheimer owed plaintiffs a duty to discuss the lien in

---

[3]We note that Riebandt's conduct in negotiating the 2009 documents does play a role in evaluating the propriety of defendants' later actions—for instance, Robinson opined that defendants had an interest in resolving the dispute in a manner that did not place Riebandt's 2009 conduct in a negative light. We also note that plaintiffs' complaint includes allegations that Riebandt's 2009 conduct was negligent. However, plaintiffs represent in their briefs that they are not seeking to hold defendants liable for 2009 conduct.

connection with the bankruptcy. Robinson opined that Ottenheimer received the information as to the existence of the mortgage lien while he was representing plaintiffs in their bankruptcy, where one aspect of the representation required decisions by plaintiffs as to how to address consensual liens on their personal residence. Robinson opined that, "[b]y failing to address the existence and significance of [the mortgage lien] in his advice to [plaintiffs], Defendant Ottenheimer facilitated the eventual and predictable difficulty that arose when [plaintiffs] secured a very favorable offer to purchase their home."[4]

¶ 82    Next, Robinson opined that Riebandt and DeWald had a conflict of interest when they attempted to address the mortgage lien in connection with the sale of plaintiffs' personal residence in 2012. Robinson opined that Riebandt and DeWald had a duty to disclose that they had an interest in achieving a resolution of the dispute in such a way that did not reflect adversely on Riebandt's handling of the initial transaction, and that there was a risk that this interest would influence their advice to plaintiffs. Instead, Robinson opined that Riebandt and DeWald engaged in the conflicted representation "and fell into exactly the concerns that should have forestalled them from doing so." Specifically, Robinson pointed to defendants' failure to even acknowledge the possibility that Bank of America's position could be found

---

[4]In his petition for rehearing, Ottenheimer asks us to find that plaintiffs "sustained actionable damages in 2012 as a result of Ottenheimer's alleged failure to provide competent advice in 2011 when he represented the Plaintiffs in their bankruptcy," based on the fact that plaintiffs did not have sufficient funds to purchase their new home in 2012 because the funds were in escrow. We note that this argument was raised for the first time in the petition for rehearing, and so is not properly before us. Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018) ("Points not argued [in an appellate brief] are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing."). Additionally, Ottenheimer's argument is based on the claim that we "conclude[d]" that defendants failed to disclose information and that if plaintiffs had been warned sooner, they could have avoided the issue. However, we reach no conclusion about whether defendants' conduct was proper, but merely present Robinson's opinion to show that plaintiffs have alleged negligence that occurred separately from the execution of the 2009 documents. Moreover, as we note later, it was not until 2015, when plaintiffs had a judgment entered against them, that plaintiffs incurred an injury, as before that time, plaintiffs still could have had the lien released.

to have merit and their advising plaintiffs to reject settlement offers that would have permitted plaintiffs to retain sufficient funds from the proceeds of the sale of their personal residence to fund the intended purchase of another home. Robinson opined that Ottenheimer "had a less acute but similar concern" in that he failed to notice or advise plaintiffs of the existence of the mortgage lien while handling the bankruptcy, and did not inform plaintiffs that he could have warned them of its existence sooner or that Riebandt could have avoided the entire issue by conditioning the documents on a successful closing.

¶ 83    Third, Robinson opined that Riebandt had a conflict of interest arising from his agency relationship with Fidelity, and that Riebandt had a duty to inform plaintiffs of that conflict prior to negotiating the indemnity agreement with Fidelity. Instead, Riebandt did not provide any such information or advise them that they could seek other counsel or another title insurer, leading plaintiffs to believe that Riebandt's loyalty to them was uncompromised. This resulted in Riebandt executing the indemnity agreement, which left plaintiffs bearing the entire risk of a negative outcome, while freezing the entirety of their sale proceeds to secure Fidelity's interest in the transaction and permitting Fidelity unfettered authority to use the escrowed funds to settle any claims.

¶ 84    Finally, Robinson opined that all of the defendants owed plaintiffs a duty to explain matters to them to the extent reasonably necessary for them to be able to make informed decisions. Robinson opined that "[i]n order to be able to make informed decisions, [plaintiffs] needed complete and candid advice on the risks they faced and alternatives available to them. Such advice was particular critical for purposes of allowing them to make informed decisions as to whether to accept or reject settlement offers from [Bank of America]." Specifically, Robinson opined that plaintiffs should have been informed as to the

risk that they could lose, the full extent of their exposure should they lose, the limits of what they could recover even if they won, and a realistic assessment of how long it could take to secure a court ruling. Instead, "[h]aving not been warned of multiple risks, including the risk that the representation by the Defendants would be impacted by their own interests, [plaintiffs] blindly trusted that they would ultimately prevail until they did not."

¶ 85       In summary, plaintiffs have identified a number of ways in which they have alleged that defendants were negligent, even apart from the original negotiation and execution of the 2009 documents. Thus, the fact that plaintiffs learned of the existence of the mortgage lien did not establish an injury. At that point, plaintiffs still had at least the possibility of having the mortgage lien released, either by Bank of America voluntarily or through court action. It was only in 2015, when there was an adverse judgment entered against them, that plaintiffs actually incurred any injury based on the existence of the mortgage lien. Accordingly, plaintiffs' cause of action accrued in 2015, meaning that their 2016 complaint was not time-barred by the two-year statute of limitations.

¶ 86       We find unpersuasive defendants' arguments as to the statute of limitations. First, Riebandt and DeWald claim that plaintiffs knew that they had a legal malpractice cause of action by July 2014, when plaintiff Louis Hermansen sent an e-mail asking if they "should consider going after [Riebandt]." However, plaintiff testified in his deposition that he sent that e-mail because the lawsuit was not leading anywhere. He testified that he "didn't know" whether he meant a lawsuit against Riebandt, and "[t]hat's why I asked [DeWald] for his opinion as to what to do." Plaintiff testified that, at that point, they realized that there had been a mistake in the forbearance agreement, and "our question was what rights do we have to try to correct this." We cannot find that this e-mail supports defendants' arguments as to

the statute of limitations. Even assuming that plaintiff knew that there was a legal malpractice action—which the record does not, as a matter of law, establish—plaintiff's testimony shows that he was expressing frustration over the mistake in the forbearance agreement in 2009. In other words, the "legal malpractice" he was aware of would have been Riebandt's 2009 conduct, which plaintiffs are not claiming in the case at bar. As explained previously, that is not the conduct for which plaintiffs are seeking to hold defendants liable. They are seeking to hold defendants liable for defendants' advice in handling the release of the lien and advising plaintiffs that the lien had no legal effect whatsoever, including the rejection of several settlement offers without explaining that their case against Bank of America could be a case that could be lost. There is no suggestion from the e-mail that plaintiffs recognized that the advice that they were receiving over the release of the lien was in any way deficient. Defendants do not cite any authority to suggest that being aware of one form of negligence triggers the statute of limitations on a different form of negligence, and we cannot find that the presence of this e-mail did so in the case at bar.

¶ 87     Riebandt and DeWald similarly attempt to argue that the adverse judgment rule is inapplicable by claiming that nothing about the litigation could have changed the fact that the mortgage lien existed. As with their earlier argument, this conflates the existence of mortgage lien with the attempts to remove the lien. However, as noted, the instant litigation is not about what Riebandt *could have done* in 2009, but about what defendants *did* beginning in 2012, when they began seeking the release of the lien.

¶ 88     Finally, we find unpersuasive Ottenheimer's claim that the statute of limitations began to run as to claims against him when plaintiffs filed their lawsuit against Bank of America in 2012. Ottenheimer claims that, when plaintiffs retained DeWald to file suit, "they were

effectively attempting to redo the services previously provided by Ottenheimer when he unsuccessfully attempted to negotiate a release of the mortgage lien." However, this claim is belied by the record, which shows that the filing of the lawsuit was a step in the progression of the case and was a step that was discussed by Ottenheimer himself. In other words, plaintiffs were not abandoning Ottenheimer or "redo[ing]" his work—they were escalating to the next step of filing a lawsuit. Consequently, we find that plaintiffs' complaint was not time-barred under the statute of limitations.

¶ 89    However, we must also consider the six-year statute of repose. As noted, a statute of repose begins to run when a specific event occurs, regardless of whether an action has accrued. *Snyder*, 2011 IL 111052, ¶ 10. In the case at bar, the trial court found that the statute of repose was triggered in 2009, when Riebandt's alleged negligence as to the negotiation of the Bank of America documents occurred.

¶ 90    " 'The statute of repose in a legal malpractice case begins to run as soon as an event giving rise to the malpractice claim occurs, regardless of whether plaintiff's injury has yet been realized.' " *Terra Foundation for American Art v. DLA Piper LLP* (*US*), 2016 IL App (1st) 153285, ¶ 31 (quoting *Lamet v. Levin*, 2015 IL App (1st) 143105, ¶ 20). "The period of repose in a legal malpractice case begins to run on the last date on which the attorney performs the work involved in the alleged negligence." *Snyder*, 2011 IL 111052, ¶ 18.

¶ 91    In the case at bar, the first instance of actionable negligence identified by plaintiffs occurred in 2012,[5] when defendants began attempting to negotiate with Bank of America to

---

[5]We note that Robinson opined that Riebandt should have informed plaintiffs about the existence of the mortgage lien in 2011, when he first discovered it, and should have informed them of the risks of inaction. However, plaintiffs' claims on appeal are focused on the settlement offers and the litigation of the lien issue, which began in 2012. Even using the 2011 date, however, would result in the statute of repose expiring in 2017, after the 2016 filing of the complaint.

release the mortgage lien, and arguably continued through 2015, when plaintiffs agreed to settle the litigation after the entry of an adverse judgment against them. Taking the 2012 date, the earliest that the statute of repose would have expired was 2018, well after the filing of the instant lawsuit. Accordingly, the statute of repose does not bar plaintiffs' claims.

¶ 92    We find unpersuasive Riebandt and DeWald's contention that there was a "continuous course of representation related to a single subject matter." Once the attempts to remove the lien commenced in 2012, that may have been the case. However, before that point, we cannot agree with defendants' claim. Riebandt and DeWald represented plaintiffs in a number of real estate-related matters, including the litigation of the other obligations on the commercial property. The 2009 mortgage lien at issue in the instant litigation was executed and recorded in 2009, then was not noticed again until 2011 at the earliest, when Riebandt became aware of it. And again, plaintiffs are not seeking to recover for any 2009 conduct, but are only alleging negligence as to the litigation of the mortgage lien, which began in 2012. Consequently, we cannot find that the statute of repose began in 2009.

¶ 93    Furthermore, even if the statute of repose was triggered in 2009, the statute was equitably tolled by defendants' conduct. We find the case at bar similar to that considered by our supreme court in *Jackson Jordan*. There, the defendant attorneys were retained to advise the plaintiff client as to a matter of patent law. *Jackson Jordan*, 158 Ill. 2d at 243. The attorneys gave the client incorrect information as to the presence of a previously existing patent, and the client proceeded with its plans in light of that information. *Jackson Jordan*, 158 Ill. 2d at 243-44. The client later discovered a patent-infringement lawsuit against a competitor and asked the attorneys to evaluate the impact of that litigation on the client's use of its own machines. *Jackson Jordan*, 158 Ill. 2d at 244. In a letter, one of the attorneys "assured [the

client] that [the other] patent was invalid and, in addition, outlined two defenses [the client] could assert against an infringement claim." *Jackson Jordan*, 158 Ill. 2d at 245. The holder of the other patent subsequently contacted the client, contending that the client's machines infringed on the patent, and the client again sought the attorneys' advice. *Jackson Jordan*, 158 Ill. 2d at 245. One of the attorneys again assured the client that the machines did not infringe on any valid patents and recommended bringing a declaratory judgment action against the patent holder. *Jackson Jordan*, 158 Ill. 2d at 245. The court found in the client's favor as to several portions of its complaint, and the attorneys assured the client that the favorable portions of the judgment would be affirmed on appeal. *Jackson Jordan*, 158 Ill. 2d at 246. However, the patent holder prevailed on appeal and on remand to the trial court. *Jackson Jordan*, 158 Ill. 2d at 246-47.

¶ 94   The client filed a legal malpractice action against the attorneys, contending that the attorneys failed to properly examine the patent and negligently failed to advise the client that its machines might infringe on the patent. *Jackson Jordan*, 158 Ill. 2d at 247. In its answer, the attorneys raised the statute of limitations as an affirmative defense. *Jackson Jordan*, 158 Ill. 2d at 247. Our supreme court found that there was a question of fact as to when the client's cause of action accrued. *Jackson Jordan*, 158 Ill. 2d at 250. However, our supreme court further found that the attorneys were equitably estopped from asserting the statute of limitations as a defense because the delay in filing was induced by the attorneys' actions. *Jackson Jordan*, 158 Ill. 2d at 251-53. The supreme court found that, "had it not been for defendant's constant reassurances that no patent was infringed upon and that [the patent holder's] claim was without merit, plaintiff's suit would not have been so delayed." *Jackson Jordan*, 158 Ill. 2d at 252.

¶ 95    Our supreme court emphasized that "[i]t is not necessary that the defendant intentionally mislead or deceive the plaintiff, or even intend by its conduct to induce delay. [Citations.] Rather, all that is necessary for invocation of the doctrine of equitable estoppel is that the plaintiff reasonably rely on the defendant's conduct or representations in forbearing suit." (Internal quotation marks omitted.) *Jackson Jordan*, 158 Ill. 2d at 252. The supreme court found:

> "The law firm in this case was hired for its advice. The advice was given and the client relied on it, allegedly to its ultimate detriment. Throughout the proceedings, however, the client was reassured as to the soundness of its legal position. The mere assertion of a contrary claim and the filing of a lawsuit were not, in and of themselves, sufficiently compelling to induce the client to seek a second legal opinion. Meritless claims and nuisance lawsuits are, after all, a fairly commonplace occurrence. It would be a strange rule if every client were required to seek a second legal opinion whenever it found itself threatened with a lawsuit. Moreover, in the case at hand, the client was lulled into a false sense of security by the firm's soothing reassurances and advice." *Jackson Jordan*, 158 Ill. 2d at 252-53.

¶ 96    In the case at bar, as in *Jackson Jordan*, plaintiffs sought defendants' advice, and defendants reassured them at every turn that their position was correct. Defendants do not point to any evidence showing that they ever discussed the risks of litigation with plaintiffs, including the possibility that they could lose and their exposure if they did so. In fact, during his deposition, DeWald struggled to identify any downside to filing the lawsuit against Bank of America, and Ottenheimer dismissed Bank of America's initial settlement offer as a "nonoffer," "nonsense," and a "nonstarter." Additionally, defendants do not point to any

36

evidence showing that they ever discussed the limits of plaintiffs' recovery with them or that plaintiffs were aware of how long the litigation might take. Instead, DeWald included a request for attorney fees in the complaint against Bank of America—which he admitted at his deposition he had no basis for including—and informed plaintiffs that they would also be able recover the amount of money that plaintiffs spent in rent payments. Riebandt also suggested that plaintiffs would be able to obtain "fast relief" from the court. Soothed by these reassurances from all three attorneys involved in the matter, as Robinson opined, "[plaintiffs] blindly trusted that they would ultimately prevail until they did not." Consequently, even if the statute of repose had been triggered in 2009, it was equitably tolled by defendants' conduct.

¶ 97     We find unpersuasive defendants' claims that equitable estoppel would not apply because the basis of a legal malpractice action cannot also constitute the basis for equitable estoppel. See *Brummel v. Grossman*, 2018 IL App (1st) 162540, ¶ 38; *Koczor v. Melnyk*, 407 Ill. App. 3d 994, 1000 (2011). Equitable estoppel would only be necessary to consider if the relevant action for purposes of the statute of repose is Reibandt's 2009 conduct that led to the recording of the mortgage lien. Defendants' subsequent conduct, then, in making representations as to the validity of the lien and the chances of success in court, is not the same conduct that gave rise to the legal malpractice. Defendants' argument attempts to have it both ways—arguing that the matter is barred because the actionable conduct occurred in 2009, but then also arguing that equitable estoppel does not apply because the actionable conduct is the representations made by defendants after 2009. In the case at bar, therefore, we find that the statute of repose was triggered no earlier than 2012, but that, even using the

2009 date urged by defendants, the statute of repose was equitably tolled by defendants' conduct.

¶ 98       Finally, defendants also raise several arguments not related to the statute of limitations or statute of repose that they claim show that summary judgment was properly entered. However, we find these arguments unpersuasive. First, defendants claim that their conduct was shielded by the "attorney judgment rule." Generally, an attorney cannot be held liable for every mistake in the practice of law. *Gelsomino v. Gorov*, 149 Ill. App. 3d 809, 813 (1986). "Illinois adheres to the rule that an attorney is not liable to his client for errors in judgment, but only for failing to exercise a reasonable degree of care and skill, notwithstanding that the exercise of that judgment may have led to an unfavorable result for the client." *Goldstein v. Lustig*, 154 Ill. App. 3d 595, 600 (1987) (citing *Smiley v. Manchester Insurance & Indemnity Co.*, 71 Ill. 2d 306, 313 (1978)).

¶ 99       However, an attorney's judgment in the preparation and handling of a case "is not *** always and automatically protected under the rubrics of 'matters of professional judgment' or 'tactical decisions.' " *Gelsomino*, 149 Ill. App. 3d at 814. "[M]erely characterizing an act or omission as a matter of judgment does not end the inquiry. The issue remains as to whether the attorney has exercised a reasonable degree of care or skill in representing his client." *Gelsomino*, 149 Ill. App. 3d at 814. " 'In Illinois the question of whether a lawyer has exercised a reasonable degree of care and skill in representing and advising his client has always been one of fact ***.' " *Nelson v. Quarles & Brady, LLP*, 2013 IL App (1st) 123122, ¶ 30 (quoting *Brown v. Gitlin*, 19 Ill. App. 3d 1018, 1020 (1974)). "Moreover, this question of fact must generally be determined through expert testimony and usually cannot be decided as a matter of law." *Nelson*, 2013 IL App (1st) 123122, ¶ 30.

¶ 100        In the case at bar, plaintiffs have provided the testimony of an expert who has opined that it was not reasonable for defendants to fail to obtain plaintiffs' informed consent in the instant litigation. Specifically, Robinson identified a number of instances during their representation when defendants failed to disclose information to plaintiffs that was necessary to enable them to make informed decisions. First, in 2011, when Riebandt discovered that the mortgage lien had been discovered but failed to inform plaintiffs or to counsel them as to the risk of inaction. Second, when defendants began their attempts to remove the lien and Riebandt and DeWald failed to inform plaintiffs that they had an interest in resolving the issue in a way that did not reflect negatively on Riebandt. Third, when Ottenheimer failed to inform plaintiffs that he had overlooked the presence of the mortgage lien when handling their bankruptcy. Fourth, when Riebandt and DeWald failed to disclose Riebandt's relationship with Fidelity, leading plaintiffs to believe that Riebandt was acting with undivided loyalty in signing the indemnity agreement. Fifth, when defendants advised plaintiffs to reject two settlement offers without informing them of the risks of loss, their exposure in the event of loss, the limits to their recovery if they won, and the length of time it would take to litigate. Thus, plaintiffs have provided evidence that defendants did not exercise a reasonable degree of care or skill in representing plaintiffs. Ottenheimer also presented the report of an expert, Flaxman, who opined that Ottenheimer's conduct in addressing the lien *did not* violate the standard of care. While we note that Flaxman's report did not address Robinson's contention that Ottenheimer violated the standard of care by failing to inform plaintiffs of the risks of their course of conduct, at a minimum, there is a question of fact as to the propriety of defendants' conduct. In the presence of this question of fact, we cannot find that summary judgment on this basis is appropriate.

¶ 101        Finally, Ottenheimer argues that summary judgment was appropriate as to the claims against him because his conduct was not the proximate cause of plaintiffs' injuries, since his involvement ended at the time the litigation commenced. However, we do not find persuasive Ottenheimer's attempts to distinguish his conduct from that of Riebandt or DeWald. "Generally, the issue of proximate causation raises an issue of fact, except where reasonable men cannot disagree." *Gelsomino*, 149 Ill. App. 3d at 815 (citing *Ney v. Yellow Cab Co.*, 2 Ill. 2d 74, 84 (1954)). Plaintiffs have alleged that Ottenheimer was involved in advising them—at a minimum—in 2011, when he handled their bankruptcy, and in 2012, when he reached out to Bank of America. His advice with respect to the latter steered plaintiffs toward filing their lawsuit against Bank of America and toward rejecting the initial settlement offer. Plaintiffs also allege that Ottenheimer was involved in conversations concerning their claims as late as 2015. The depositions of all parties confirm his involvement in attempting to address the mortgage lien.

¶ 102        Additionally, Robinson identified several instances in which Ottenheimer's conduct specifically—apart from the other defendants—was problematic. For instance, Robinson opined that Ottenheimer failed to notice or advise plaintiffs of the existence of the mortgage lien during the bankruptcy proceedings, at a time when they could have addressed the issue without the pressure of a closing date. Ottenheimer also never informed plaintiffs that he could have warned them sooner or that the issues with the mortgage lien could have been avoided by Reibandt in 2009. More problematically, Ottenheimer specifically characterized the first settlement offer by Bank of America as "nonsense" and a "non-starter," without explaining the risks of rejecting the offer, and did not familiarize himself with the entirety of plaintiffs' file, including the existence of the indemnity agreement, which he testified would

have changed his advice. Robinson also opined that the conduct of all three defendants led plaintiffs to believe that defendants were adequately representing their interests and that plaintiffs relied on all three defendants coordinating with each other. While the parties may dispute the extent of Ottenheimer's involvement or the consequences of that involvement, that is a decision for the trier of fact, not for disposition on summary judgment. Accordingly, we find that the trial court erred in granting summary judgment in defendants' favor.

¶ 103                                    CONCLUSION

¶ 104        For the reasons set forth above, the trial court erred in granting summary judgment in defendants' favor. First, plaintiffs' complaint was not barred by the two-year statute of limitations, where their cause of action for legal malpractice did not accrue until the 2015 entry of an adverse judgment against them. Additionally, plaintiffs' complaint was not barred by the six-year statute of repose, where the first act of actionable negligence occurred in 2012 and the last act of negligence occurred in 2015.

¶ 105        Reversed and remanded.